THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. D. C. LINDLEY.

1. DANGEROUS POSITION *Voluntarily Taken* — *Company not Liable for Damages.* Where a shipper of stock was on a freight train accompanying two loads of his stock, which were being transported to market, and the train had attached to it a caboose for the shippers on the train to ride in, and while the train was stopping at a station the conductor addressed the shipper as follows: "You get on top and help signal until the last load of hogs comes up, and we will water them," and the shipper voluntarily obeyed the order or direction and got upon the train moving backward, and while on the top of the train near to the end of a car, watching a brakeman trying to make a coupling, was severely injured by a sudden forward motion or jerk of the train, without any signal thereof, *held*, that as the shipper voluntarily placed himself in a position of known danger, and as he was not upon the top of the train to look after or care for his stock, the railroad company is not liable in damages for his injuries.

2. NEGLIGENCE — *No Wantonness.* An examination of the testimony and special findings of the jury does not establish such gross negligence in the case as amounts to wantonness or malice on the part of the railroad company, or any of its employés.

*Error from Sumner District Court.*

ON the 26th day of February, 1887, *D. C. Lindley* filed his amended petition against the *Atchison, Topeka & Santa Fé Railroad Company*, to recover $25,000 damages for cer-

tain personal injuries received by him on July 16, 1885, at a point upon the railroad between Lawrence and Argentine. On the 21st day of April, 1887, the railroad company filed an amended answer, setting up, first, a general denial; second, contributory negligence; and third, that plaintiff was wrongfully on the train under a stock pass issued to W. T. Lindley, and not to the plaintiff. A copy of the stock-contract pass is as follows:

"ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY. —*Live-Stock Contract.*—[Duplicate.]—No. of cars, 2,128, 13,372; initials, A. T. Perth Station, July 15, 1885: Received of James Holland 2 cars of stock (85 head) to be delivered at Kansas City station at special rate, being — dollars per car for horses and mules, — dollars per car for cattle and hogs, — dollars per car for sheep. Consigned to G. W. Kefner, at Kansas City, Mo., station.

"1. Agreement made between the Atchison, Topeka & Santa Fé Railroad Company, party of the first part, and James Holland, party of the second part: Witnesseth, that in consideration of the above-named special rates and other valuable considerations (hereby acknowledged) the said party of the second part hereby relieves said party of the first part from the liability of a common carrier in the transportation of said stock, and agrees that such liability shall be only that of a private carrier for hire.

"2. And said party of the second part hereby accepts for such transportation the cars provided by said company and use for shipment of said stock, and hereby assumes all risk of injury which the animals, or any of them, may receive in consequence of their being wild, unruly, or weak, or maiming each other or themselves, or in consequence of heat or suffocation or other ill effects of being crowded in the cars, or on account of being injured by the burning of hay, straw, or other material used by the owner for feeding the stock or otherwise; and also all risk of damage or injury or loss whatever which may be sustained by reason of any delay or detention in such transportation, whether occasioned by any mob, strike, or threatened violence to person or property from any source, or injury to track or yards, or any or all other causes, whether mentioned or not, and all risk of the escape of any portion of said stock, or loss of or damage from any other cause or thing not resulting from the willful negligence of the agents of said party of the first part.

"3. And said party of the second part further agrees that he will load and unload said stock at his own risk, and feed, water and attend to the same at his own expense and risk while it is in the stock-yards of the party of the first part awaiting shipment, and while on the cars, or at feeding or transfer points, or where it may be unloaded for any purpose.

"4. And it is further agreed that said party of the second part will see that said stock is securely placed in the cars furnished, and that the cars are securely and properly fastened so as to prevent the escape of said stock therefrom.

"5. And it is further agreed, that in case the said party of the first part shall furnish laborers to assist in loading and unloading said stock, they shall be subject to the order and be deemed employés of said party of the second part while so assisting.

"6. And for the consideration aforementioned, said party of the second part further agrees that as a condition precedent to his right to recover any damage for loss or injury to said stock, he will give notice in writing of his claim therefor to some officer of said party of the first part, or its nearest station agent, before said stock is removed from the place of destination above mentioned, or from the place of delivery of the same to said party of the second part, and before such stock is mingled with other stock.

"7. Agents of this company are not authorized to agree to forward live stock to be delivered at any special time.

"8. The evidence that said party of the second part, after a full understanding thereof, assents to all the conditions of the foregoing contract, is his signature thereto.

A. E. FINCH, Agent for the Company.

JAMES HOLLAND, Shipper.

"Witness: W. E. KEER.
(To be other than either signer of the contract.)

"Not negotiable.

"NOTICE.—Agent will have shipper sign duplicate in copying-ink, and take an impression of same before forwarding to general freight agent.

"Executed in duplicate.

*To stock shippers, agents, and conductors:*

"9. On and after May 1, 1884, the following rules will govern the issuance of passes to men in charge of live stock, and their return:

"10. On shipments of horses, mules, cattle, hogs and sheep

belonging to one owner, shippers will be passed on freight train with stock, and on contracts as follows:

"11. On shipment of one car live stock, one man will be carried free one way in charge of stock, and his contract will be authority for conductors to pass him. No return passes will be given on account shipment one car.

"12. One man with two to three cars, two men with four to seven cars, three men with eight to twenty cars, four men with twenty-one cars or more, which is the maximum number that will be passed with stock for one owner.

"13. The agent at the station where the stock is loaded will enter on the back of the contract in ink and erase with ink the spaces not used, the name or names of the persons who are actually entitled to pass free with stock, which is the authority for the conductors to accept such and pass the parties; when no return pass is given, forwarding agent will erase with ink the space provided for return pass.

"14. Names entered in pencil will not be accepted by conductors when no person is in charge; erase all the spaces on the back of the contract; agents will refuse to enter any names on the contract but those of the owner or employés in charge of stock, without regard to passes required by the number of cars.

"15. It is understood that the shippers are passed on freight trains to take care of their stock; and stock contracts, except to return, countersigned as below, are not good on passenger trains.

"16. Return passes, good on all trains that carry passengers, will be given to the parties passed with stock on stock contracts only, and will not be accepted unless countersigned and stamped by the general freight agent at Topeka, or by the agent at the station to which stock is contracted.

"17. Return passes will not be given unless contracts are presented within ten days from their date, and will be good only when used within three days after being countersigned and stamped. When contract is presented for return trip, conductor of last division will be particular to take up and return it to the general freight agent.

"18. Contracts for single-car shipments must be taken up on the trip (see note 10) and returned to the auditor with ticket collections by conductor of last division; no return pass will be given on account of emigrant outfit.

"19. For other rules governing the shipment of live stock, see local tariff. H. C. BARLOW,
*General Freight Agent.*"

"RELEASE.

"20. We, the undersigned, in charge of live stock mentioned in the within contract, in consideration of the free pass granted us by the Atchison, Topeka & Santa Fé Railroad Company, hereby agree that said company shall not be liable to us for injury or damage of any kind suffered by us while in charge of said stock, or while traveling upon such free pass.

"July 15, 1885.            WM. F. LINDLEY,
(With two cars, the numbers of which are noted within.)

"21. Pass on freight trains only, Wm. F. Lindley, party in charge accompanying stock.      A. E. FINCH, *Agent.*"

"22. Only names of parties entitled to pass must be entered, and draw a pen through the blank spaces.

"Agents will make and have signed two copies of contract, giving original to shipper and sending duplicate to general freight office.

"ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY. —Good for return passes from —— to —— for the person or persons (——) named above, if stamped or countersigned by the general freight agent, or agent at delivery station.

"Void unless used within three (3) days from date."

Trial had at the May term of the court for 1887, before the court with a jury. The jury returned a verdict for the plaintiff for $9,650. The jury also made the following special findings of fact:

"1. After watering the car of hogs on the first section of the train, where did the plaintiff, D. C. Lindley, go? A. On the top of the rear of the portion of the train attached to the engine.

"2. Where did the plaintiff, D. C. Lindley, first go after getting on top of the train, if toward the engine, how many cars? A. On the second or third car from the rear portion of that portion of the train attached to the engine.

"3. For what purpose, if any, did the plaintiff, D. C. Lindley, go to the rear car on the first section of the train, after going toward the engine? A. It is not clear to the minds of the jury.

"4. What, if anything, did the plaintiff, D. C. Lindley, do after reaching the rear car of the first section, and upon what part of the rear car did he stand? In what direction was he looking? A. Walked to rear end of run-board in center of car toward the detached portion of the train.

"5. What caused the plaintiff, D. C. Lindley, to fall from he car? A. By a sudden forward motion of the train.

"6. Was the plaintiff, D. C. Lindley, guilty of negligence in going to end of rear car of the first section of the train? A. Not by reason of going.

"7. Did the engineer who was operating the engine at the time of the accident see the plaintiff, D. C. Lindley, on the top of the first section of the train to which the engine was attached, at any time just prior to or at the time of the accident? A. We do not know.

"8. Were any of the train-men on the train under the influence of intoxicating liquor? If so, who? A. We do not know.

"9. Were any of the men who were running and operating the train guilty of any negligence at the time of the accident; if yes, what did it consist? A. Yes; in the hurried manner in which the employés of the said train managed the same.

"10. Was the plaintiff, D. C. Lindley, guilty of negligence in going on top of the train at Eudora just prior to the accident? A. No.

"11. Who made the coupling at the time of the accident, and was he the head or rear brakeman? A. Guy, the head brakeman.

"12. Was the plaintiff, D. C. Lindley, watching the brakeman between cars making the coupling at the time of the accident? A. Yes.

"13. Was it part of the duties of the plaintiff, D. C. Lindley, in taking care of the two car-loads of stock on the train, to assist the train-men in the management, running or coupling of the cars on the train and in making signals to the engineer? A. No.

"14. How much was the damage to the plaintiff, D. C. Lindley, on account of expenses while at Kansas City, Mo., and in what do they consist? Answer fully. A. About 333 dollars; doctor bills, nurse, and board.

"15. Did the engineer who was operating the engine at the time of the accident and just prior thereto, have any knowledge that the plaintiff, D. C. Lindley, was on top of the train of cars attached to the engine? A. We do not know.

"16. Did the engineer who was operating the engine at the time of the accident to the plaintiff and just prior thereto, use ordinary care in handling the engine? A. No."

The railroad company filed its motion for judgment upon

the special findings of the jury, notwithstanding the verdict, and also filed its motion for a new trial. These motions were heard on the 6th day of June, 1887, and taken under advisement until the next term of the court. At the September term of the court for 1887, the motions were overruled and judgment was rendered in favor of the plaintiff and against the railroad company for the sum of $9,833. The *Company* excepted, and brings the case here.

*Geo. R. Peck, A. A. Hurd, O. J. Wood,* and *Robert Dunlap,* for plaintiff in error.

*Charles Willsie,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action by D. C. Lindley against the Atchison, Topeka & Santa Fé Railroad Company for injuries received while traveling on a stock train, and resulted in a verdict against the company for $9,650. McCambridge was the conductor of the train, Allen was the engineer, and Guy the head brakeman. Lindley was a live-stock dealer, fifty years of age, residing in Albion, Harper county, in this state. He had shipped live stock for thirty-four years. The alleged cause of action occurred on the 16th day of July, 1885. Lindley had shipped on the defendant's train one carload of hogs and one car-load of cattle from Perth station, in Sumner county, to be transported to Kansas City, Missouri, and was on top of one of the stock cars just before his injuries. He arrived at Eudora, a station between Topeka and Argentine, between five and six o'clock in the morning. The train consisted of forty-five cars loaded with stock. Soon after arriving at Eudora, eight or ten of the cars, with the caboose, broke or separated from the main train.

The petition alleged among other things that —

"The conductor then in charge of the train, totally disregarding the safety of human life and being grossly careless of the safety of the passengers on the train, and well understanding the culpably negligent manner in which the engineer

was handling the train, carelessly and negligently asked, directed and induced the plaintiff to climb up on the top of the cars and signal for the front portion of the train to be backed up so as to have the rear and front portions of the train coupled together, and then signal the cars containing hogs needing water in the hind part of the train, so that the conductor could water them; that the front part of the train was then backed up to the hind portion of the train, and while the brakeman was between the cars, making the coupling, and while plaintiff was on top of the cars, looking in an opposite direction from the engineer, the latter, then and there operating the engine of the train, did then and there, with gross and wanton negligence and with utter disregard for human life, without any warning, suddenly throw open the throttle of the engine and turn on all the steam power possible, so that the engine started up with the cars with so much force and power that the life of any human being upon the top of the train was unsafe; that the train started up so suddenly and with such a tremendous jerk that it threw the plaintiff clear off his feet and pitched him head foremost down upon the railroad track, where he would have been run over and mashed if he had not been snatched from his perilous condition."

The evidence upon the part of Lindley tended to show that when the train stopped at Eudora, he got out of the caboose with McCambridge, the conductor, and T. V. Borland, another shipper having stock upon the train; that they walked up to the water tank; that the engine and three car-loads of hogs had passed the tank; that the plaintiff then asked the conductor if he would not back up the train and water the three cars that had passed the tank; that the conductor said, "No, the hogs are not yours;" that finally the train was backed up to water or shower the hogs; that the conductor, who was standing at the water tank, looking down at Lindley and Borland, said, "You fellows stand down there, and when a car of cattle or horses comes along that you don't want watered, throw down your hands and I will turn the water off, and when you come to a car-load of hogs throw up your hands and I will shower them;" that Lindley and Borland did as the conductor suggested; that about a dozen or four-

46—42 KAS.

teen car-loads of hogs were then watered; that when the last car-load of those cars was watered, the conductor looked down again and said to Lindley and Borland, "You fellows get up on top and help signal until the last car-load of hogs comes up, and we will water them;" that Lindley and Borland got upon the top of the train as requested; that Lindley got upon the hind end, but stepped from there to a car near the engine; that Borland remained on the end car; that the train then backed down to where the detached portion of it was; that when the train got down to the detached cars it stopped quite a long time; that Lindley had curiosity enough to walk down to where Borland was; that at this time the train was standing still; that when the plaintiff came near to where Borland was, the brakeman was in the act of coupling the cars; that the plaintiff saw Borland looking down at him; that plaintiff walked up toward Borland and got near the end of the car; that just at that moment Borland threw up his hands and said, "Look out;" that the crash then came; that the coupling-pin broke and the cars separated; that Lindley fell off and was severely bruised and injured. The court charged the jury among other things as follows:

"If you find from the evidence that the plaintiff went upon the top of the train at the request of the conductor of the train to assist the train-men in giving signals to the engineer to back up the train for the purpose of coupling on to the part which had been detached, you would be justified in finding that he went upon the train voluntarily, as the conductor in so doing would be acting beyond the scope of his employment."

The jury also made the following findings of fact:

"Who made the coupling at the time of the accident, and was he the head brakeman? Guy, the head brakeman.

"Was the plaintiff, D. C. Lindley, watching the brakeman between the cars making the coupling at the time of the accident? Yes.

"Was it a part of the duties of the plaintiff, D. C. Lindley, in taking care of the two car-loads of stock on the train, to assist the train-men in managing, running or coupling the cars on the train and in making signals to the engineer? No."

The plaintiff contends that he was thrown or pitched off the top of the car by a sudden forward motion of the train, and in this he is supported by the findings of the jury. The defendant insists that Lindley fell off the car while the slack of the train was running out. The important question in the case is, whether, under the allegations of the petition, the testimony of the plaintiff, the instructions of the court, and the special findings of the jury, the plaintiff is entitled to recover. We think not. Lindley knew, according to his own testimony, the places of danger and safety upon the train. He was under no obligation to climb upon the top of the train and signal the conductor or any other employé. "Out of curiosity" he walked down to the end of the car where the brakeman was coupling the train. At the time of the accident he was watching the brakeman coupling the cars. He assumed a position on the top of the cars which he knew was peculiarly dangerous and perilous. It was not necessary for him to be there to care for his stock, or as a passenger. The order or direction of the conductor to him "to go on top of the cars and help signal," was entirely without the routine of the conductor's duties; and as it was voluntarily obeyed by Lindley, it could not fasten any liability on the railroad company. If he acted as an employé or brakeman, it was of his own volition. He occupied merely the position of a passenger who voluntarily assumed a very dangerous position to make signals at the request of the conductor as a matter of accommodation.

1. Dangerous position voluntarily taken—company not liable for damages.

In *McCorkle v. C. R. I. & P. Rly. Co.*, 16 N. W. Rep. 714, it is said:

"Plaintiff got off a cattle train at night to examine his cattle when the train stopped for that purpose, and not hearing the signal to start, attempted to get on a freight car after the train had started, because he supposed, from the 'lively rate' the train was moving, he would not be able to get on the caboose at the rear of the train, which had been provided for passengers. At the time he attempted to get on the freight car, he had a 'prod-pole' and a lantern in his hand. His foot caught in a hole caused by a defective plank in the bridge over

which the train was passing, and he fell from the car and was injured. *Held,* That he was guilty of contributory negligence, and not entitled to recover."

In *Pa. Rld. Co. v. Langdon,* 92 Pa. St. 21, it is said:

"On the other hand, should a passenger insist upon riding upon the cow-catcher, in the face of the rule prohibiting it, and as a consequence should be injured, I apprehend it would be a good defense to an action against the company, even though the negligence of the latter's servants was the cause of the collision or other accident by which the injury was occasioned. And if the passenger thus recklessly exposing his life to possible accidents were a sane man, more especially if he were a railroad man, it is difficult to see how the knowledge or even the assent of the conductor to his occupying such a position could affect the case. There can be no license to commit suicide. It is true the conductor has the control of the train, and may assign passengers their seats. But he may not assign a passenger to a seat on the cow-catcher, a position on the platform, or in the baggage car. This is known to every intelligent man, and appears upon the face of the rule itself. He is expressly required to enforce it, and to prohibit any of the acts referred to, unless it be riding upon the cow-catcher, which is so manifestly dangerous and improper that it has not been deemed necessary to prohibit it. We are unable to see how a conductor, in violation of a known rule of the company, can license a man to occupy a place of danger so as to make the company responsible."

In *L. V. Rld. Co. v. Greiner,* 113 Pa. St. 600, is is said:

"Where one negligently and without excuse places himself in a position of known danger and thereby suffers an injury at the hands of another, either wholly or partially by means of his own act, he cannot recover damages for the injury sustained. The contributory negligence which prevents recovery for an injury, however, must be such as coöperates in causing the injury, and without which the injury would not have happened."

In *L. R. & F. S. Rly. Co. v. Miles,* 13 Am. & Eng. Rld. Cases, 10, it is said:

"But there are certain portions of every railroad train which are so obviously dangerous for a passenger to occupy, and so

plainly not designed for his reception, that his presence there will constitute negligence as a matter of law, and preclude him from claiming damages for injuries received while in such position. A passenger who voluntarily and unnecessarily rides upon the engine or the tender, or upon the pilot or bumper of the locomotive, or upon the top of a car, or upon the platform, cannot be said to be in the exercise of that caution and discretion which the law requires of all persons who are of full age, of sound mind and ordinary intelligence."

In *Flower v. Penn. Rld. Co.*, 69 Pa. St. 210, an engine with one freight car had been detached from a train, and was stopped at a water station. The fireman requested a small boy standing near to put in the hose and turn on the water. While he was climbing on the tender to do this, the other freight cars belonging to the train came down without a brakeman and struck the car behind the tender. The boy fell, and was crushed to death. The court held that the company owed no special duty to the boy, saying:

"The case turns wholly on the effect of the request of the fireman, who was temporary engineer. Did that request involve the company in the consequences? . . . The fireman, through his indolence or haste, was the cause of the boy's loss of life. Unless his act can be legally attributed to the company, it is equally clear the company was not the cause of the injury. The maxim, *Qui facit per alium facit per se*, can only apply where there is an authority, either general or special. It is not pretended there was a special authority. Was there a general authority which would comprehend the fireman's request to the boy to fill the engine tank with water? This seems to be equally plain without resorting to the evidence given, that engineers are not permitted to receive anyone on the engine but the conductor and fireman, or superintendent; that it is the duty of the fireman to supply the engine with water; that he has no power to invite others to do it, and can leave his post only on a necessity."

In *Railroad Co. v. Jones*, 5 Otto, 439, Jones was one of a party of men employed by a railroad company in constructing and repairing its roadway. They were usually conveyed by the company to and from the place where their services

were required, and a box car was assigned to their use. Mr. Justice Swayne, delivering the opinion of the court, said:

"The plaintiff had been warned against riding on the pilot, and forbidden to do so. It was next to the cow-catcher, and obviously a place of peril, especially in case of collision. There was room for him in the box car. He should have taken his place there. He could have got into the box car in as little, if not less, time than it took to climb on the pilot. The knowledge, assent, or direction of the company's agent, as to what he did, is immaterial. If told to get on anywhere, that the train was late, and that he must hurry, there was no justification for taking such a risk. As well might he have obeyed a suggestion to ride on the cow-catcher, or put himself on the track before the advancing wheels of the locomotive. The company, though bound to a high degree of care, did not insure his safety. He was not an infant, nor *non compos*. The liability of the company was conditioned upon the exercise of reasonable and proper care and caution on his part. Without the latter, the former could not arise. He and another who rode beside him were the only persons hurt upon the train. All those in the box car, where he should have been, were uninjured. He would have escaped also if he had been there. His injury was due to his own folly and recklessness. He was himself the author of his misfortune. This is shown with as near as an approach to a demonstration as anything short of mathematics will permit."

In *G. P. Rly. Co. v. Propst*, 83 Ala. 518, it was decided that—

"A railroad company is liable, as principal, for injuries received by a person who was employed by the conductor of a freight train as brakeman during the trip, while acting under the orders of the conductor in coupling cars; but not if the person so acting and injured was only a passenger, who was not employed by the conductor, nor under any obligation to obey his orders."

In the opinion rendered by Chief Justice Stone it was said that—

"So far as this count informs us, the plaintiff was a mere passenger on the train; and, so far as the right to control or

direct the movements of the plaintiff is shown in this count, the conductor would have had as much authority over any other passenger, or even a bystander, as he had over him. Such order or direction, as averred, is entirely without the routine of the conductor's duties."

In *G. P. Rly. Co. v. Propst*, 85 Ala. 203, the conductor addressed the plaintiff as follows: "Will., come here, and make this coupling for me;" and the plaintiff was injured in conforming to this order or request. The court said: "Such an order or direction could not fasten a liability on the railroad corporation." (See also *Gilliam v. S. & N. Rld. Co.*, 70 Ala. 268; *Howard v. K. C. Ft. S. & G. Rld. Co.*, 41 Kas. 403.)

We are referred to *I. & S. L. Rld. Co. v. Horst*, 93 U. S. 291, as decisive in favor of the recovery of the plaintiff. That case decides that a shipper accompanying his stock on the train is entitled to the rights of a passenger, but in many particulars widely differs from this. In that case the shipper was commanded by the conductor to get out of the caboose and go on top of the train, because the caboose was about to be detached. The shipper had no choice but to obey or leave his stock to go forward without anyone to accompany or take care of them. In this case there was a caboose accompanying the train, where the plaintiff might have ridden in safety. He did not go upon the top of the train to accompany his stock, or to take care of them; he went, as before stated, merely to comply with the order or request of the conductor to assist in signaling the train. The other cases referred to by the plaintiff are not contrary, we think, to the law as before declared.

In answer to one of the questions, the jury stated that the plaintiff was not "guilty of negligence in going on top of the train at Eudora just prior to the accident." This finding of the jury, however, is not conclusive. If the plaintiff's evidence, with all the legitimate inferences which a jury might reasonably draw from it, is insufficient to sustain a verdict in his favor, so that a verdict for the plaintiff, if one should be

returned, would be set aside, the court may properly direct a verdict for the defendant without submitting the evidence to the jury. In *A. T. & S. F. Rld. Co. v. Plunkett*, 25 Kas. 188, the jury found that Plunkett, at the time of his injuries, was in the exercise of reasonable and ordinary care. This finding was not considered sufficient to authorize the verdict, in view of the testimony and the other findings. Mr. Justice VALENTINE in that case said:

"If the findings in detail contradict the general findings, we may order the judgment to be rendered in accordance with the findings in detail, and wholly ignore the general findings. For instance: Where a question of negligence arises in the case, the jury cannot be allowed to say conclusively, after finding certain special facts, that these facts constitute negligence, when in fact and manifestly they do not constitute negligence."

Finally, it is claimed that although Lindley might have been guilty of contributory negligence, he is entitled to recover, because the conductor and engineer of the railroad company were guilty of gross negligence. Neither the findings of the jury nor the testimony introduced in the case establishes that the company or any employé was guilty of such gross negligence as amounted to wantonness. (*S. K. Rly. Co. v. Rice*, 38 Kas. 398; *K. P. Rly. Co. v. Whipple*, 39 id. 531.) Allen, the engineer, testified that the fireman signaled him to stop. Bradshaw, the fireman, testified that Guy, the head brakeman, signaled him. The jury found that the engineer did not see the plaintiff on top of the train just prior to the accident; therefore, he was not actuated either by gross negligence or malice toward him, or anyone else. The conductor did not give the engineer the signal to move forward. The jury, in returning their answers about the negligence of the employés of the train, found as follows:

2. Negligence— no wanton- ness.

"Q. Were any of the men who were running or operating the train guilty of any negligence at the time of the accident? if yes, in what did it consist? A. Yes; the hurried manner in which the employés of the train managed the same.

"Q. Did the engineer who was operating the engine at the

time of the accident to the plaintiff and just prior thereto, use ordinary care in handling the engine? A. No."

These answers do not tend to show malice or gross negligence.

The judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.