THE FORT SCOTT, WICHITA & WESTERN RAILWAY
COMPANY *et al.* v. J. H. SPARKS.

1. VALID CONTRACT *between Company and Shipper of Live
   Stock.* A written contract with a railway company, signed by the
   shipper of live stock, providing that such shipper, while being
   carried upon the train transporting his stock, shall remain in the
   caboose-car attached to the train while the same is moving, is
   valid and binding between the parties thereto. Such a contract
   is a reasonable one, intended for the safety and convenience of
   the shipper, as well as for the protection of the railway company
   carrying him. It does not contravene any law or a sound public
   policy.

2. —— *No Recovery for Injuries.* The admitted facts and the
   special findings of the jury examined, and *held* thereon, that S.,
   a shipper of live stock, who had signed a written contract with
   the railway company to remain in the caboose-car attached to the
   train carrying his stock while the same was moving, is not en-
   titled to recover for injuries received by him while voluntarily
   standing or walking upon a moving car in violation of the terms
   of his contract.

*Error from Harvey District Court.*

ON the 13th day of July, 1883, *J. H. Sparks* com-
menced his action against the *Fort Scott, Wichita &
Western Railway Company* and the *Missouri Pacific
Railway Company* to recover, $50,000 for personal in-
juries which he alleged resulted to him from the neg-
ligence of the companies. Trial had, at the February
term of the court for 1890, before the court with a jury.
On the 3d day of March, 1890, the jury returned a
verdict in favor of the plaintiff and against the de-
fendants for $10,000, and also made special findings of
fact in writing. On the 3d of March, 1890, the rail-
way companies filed their motions for judgment in
their favor upon the special findings of the jury not-
withstanding the general verdict. These motions
were overruled. Thereupon the railway companies

filed their motions for a new trial containing the usual statutory grounds. These motions were heard on the 20th of May, 1890, and overruled. Thereupon the court rendered judgment in favor of J. H. Sparks and against the railway companies for $10,000, with costs taxed at $382.64. The *Railway Companies* excepted, and bring the case here.

*J. H. Richards,* and *C. E. Benton,* for plaintiffs in error.

*J. D. Houston,* and *W. H. Boone,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J. : The Fort Scott, Wichita & Western Railway Company, on the 18th day of May, 1888, made a written contract with J. H. Sparks to transport eight car-loads, consisting of 107 head of cattle and 75 hogs, from Conway Springs, in this state, *via* Kansas City, Mo., to Chicago, Ill., and to carry Sparks on the train in which his stock was taken. The contract was signed by Sparks and C. M. Stewart, the agent of the railway company, in duplicate. One was delivered to Sparks prior to the shipment of the stock and the other was retained by the agent of the railway company. The contract contained the following provisions :

"For the consideration aforesaid, the said second party hereby further agrees that the said persons in charge of said stock under this contract shall remain in the caboose-car attached to the train while the same is in motion, and that whenever such persons shall leave the caboose-car or pass over or along the cars or track they shall do so at their own risk of personal injury from every cause whatever, and that the said first party shall not be required to stop or start its trains or caboose-cars from depots or platforms, or to

furnish lights for the accommodation or safety of such persons.''

At the date of the contract the stock was shipped from Conway Springs, and Sparks had accompanying him James M. Harper, J. A. Fowler, J. C. Dudley, and R. F. Hargrove, as attendants of the stock. The train consisted of 11 cars of stock, a caboose, an engine, and tender.. Between Conway Springs and El Dorado, Sparks and his men rode in the caboose-car, attached to the train, arriving at El Dorado, in this state, the end of a division, about 8 o'clock p. m. on the 18th. The train stopped at the station, with the engine at the water-tank. Sparks was a regular shipper of stock over the road, and had general knowledge of the depot and yards at the station. Before their arrival at El Dorado, Sparks and his men were notified that they would have to change cabooses. Sparks got out of the caboose after the train had come to a full stop, and started with Harper and their luggage for the outgoing caboose. After the arrival of the train at El Dorado, the incoming caboose was detached from the train and placed on to a switch north of the main track. The outgoing caboose was located on a switch south of the main track, and 400 to 500 feet from the point where the incoming caboose stopped. This caboose had a red light on the outside at its west end. There was only one track — the main track — between the incoming caboose and the outgoing caboose. There were no switch-engines or trains moving at the time in the yards at the station, except the train carrying Sparks's stock. Main street, near the passenger depot, and not far from where the west end of the stock-train stopped on its arrival at the station, was lighted by an electric arc-light, and there was light at the depot and other parts of the

yards. The direction of the outgoing caboose was pointed out to Harper, who was with Sparks. The latter, with Harper, walked eastward in the direction of the outgoing caboose from 200 to 300 feet. This caboose was from 200 to 300 feet further east. While proceeding on their way in the direction of the outgoing caboose, they came up to the main stock-train. They mounted with their luggage to the top of the nearest car, directly after which they, together with the other three attendants, were transferred to the point of the outgoing caboose. They got on the top of the stock-car about four minutes after leaving the the incoming caboose. James M. Harper, a witness for plaintiff below, testified, among other things, as follows :

"Ques. If any one suggested that you get on top of the car that you did finally get onto, who made the suggestion to get up there? Ans. Mr. Sparks.

"Q. State fully how he came to make the suggestion — the circumstances of it? A. That if we got on top of the car in which the stock was loaded we would run no chance of being left, and he was not certain as to the caboose we were to get into.

"Q. I will ask you to state if you didn't insist on going and getting into the caboose? A. There was an argument — a little controversy — between Mr. Sparks and me, as to what caboose we would get into. I was going to the caboose myself, and he said to get on the train and we would not be left.

"Q. What car did you get onto? A. A car belonging to the Missouri Pacific.

"Q. Where was this car? A. This car was east of the caboose which we were on.

"Q. How far east? A. Well, I should judge about a block and a half — a block, possibly.

"Q. What did Mr. Sparks do after you got on top of the car? A. Mr. Sparks went on ahead to look after the cattle just immediately after we got on

"Q. When the train was backed back on to the caboose, where was Mr. Sparks? A. He was on top of the box car.

"Q. And when you climbed onto it? A. Yes, sir.

"Q. How many persons up there at that time? A. I am not certain whether all five were up or not on top of that box car.

"Q. What did you do immediately after the train was coupled onto the caboose? A. We put our provisions into the caboose — provisions and luggage.

"Q. How did you do that? A. We handed them down from the top of the car to a person standing at the end of the caboose, receiving them into the caboose.

"Q. What did you do next — what did Mr. Sparks do? A. He went forward to look after the cattle.

"Q. After you had backed up to the caboose or before? A. I think after we had backed on to the caboose; but, however, I am not certain on that point.

"Q. When you had gotten your luggage down, what did you do next? A. We got on top of the caboose. We were getting into the caboose, or went to get in at the top.

"Q. Mr. Sparks was on top of the caboose at this time? A. Yes, sir.

"Q. What became of Mr. Sparks? A. Mr. Sparks was knocked off.

"Q. By what? A. By the bridge.

"Q. What part of the bridge? A. The west end of the bridge.

"Q. What part of the west end? A. The south part of the west end.

"Q. What was that — what was there? A. The framework of the bridge.

"Q. Was there a brace there? A. Yes, sir.

"Q. What struck him? A. I think it was the brace.

"Q. What became of him when he was knocked off? A. He fell down on the framework of the bridge."

Sparks testified, among other things, as follows :

"Q. Did you have a conversation with Mr. Harper about getting upon that cattle-car, and did n't he tell you that he wanted to go on the caboose? A: I do n't remember whether he did or not; I think I had some conversation with him, no doubt.

"Q. And he wanted to go on down to the caboose? A. Yes, sir.

"Q. And you said, ' No ; we 'll get upon the box car, and then we will be sure to find our car?' A. Yes, sir.

"Q. And then you got upon top of the box car. Did you get up immediately after this conversation was had? A. Yes, sir.

"Q. How soon after this conversation was had before you got up? A. I do n't remember just how long; I suppose it was done quick, of course.

"Q. Well, about how long after this conversation was it that you got upon this box car — how long before you went to get up? A. I could n't scarcely form an idea what length of time, or what the conversation consisted of.

"Q. Do n't you remember, before going on the train, of the employee telling you that before you got there there would be a caboose waiting? A. I do n't remember their telling us, but I knew they had to have a caboose to take us on.

"Q. Well, do n't you remember of their telling you that? A. I do n't remember it. A man would n't have to ask that question.

"Q. You knew there was always a caboose there to take you on ? A. Yes.

"Q. And that the caboose was generally on the house-track ? A. Yes, sir ; on the east end.

"Q. On what is called the ' house-track ?' A. I do n't know about the track.

"Q. Well, it is a track that runs from the back of the depot on the south side of the yard. A. I could n't say ; I had n't time to locate the depot.

"Q. You had been there frequently ? A. Yes, sir.

"Q. You knew the ordinary distance between these

cabooses? A. Yes; I knew about how long the switches were.

"Q. After you got on top of that car, what became of you? A. Well, they handed down the luggage — some of the other fellows — and went in, and I and another party heard a number of hogs squealing like there was steers laying on them, and we started to go and see about them, but saw we were not able to do it, and immediately started back, and the other party got in. I would have got in, I suppose, if it had n't been for the bridge. One man got in ahead of me.

"Q. And you stood there and was waiting until they had got in and out of your way? A. Yes, sir.

"Q. Were you standing with your back to the engine? A. Yes, sir.

"Q. Looking down toward the caboose? A. Yes, sir.

"Q. Ready to get in? A. Yes, I was standing ready to get in.

"Q. How far was that from the place they hitched on to the caboose? A. I could n't say certainly; not very far — 150 yards, or such a matter

"Q. At about what rate were the trains running? A. Quite a lively rate; I could n't say how fast; it was down grade and, of course, it was double-quick.

"Q. What became of you? A. Well, that's as far as I know.

"Q. Well, where do you remember of being? A. They brought me back home to Conway Springs."

When Sparks was knocked off of the top of the caboose he was severely injured. Under the written contract between the Fort Scott, Wichita & Western Railway Company and Sparks, the latter was required to "remain in the caboose-car attached to the train while the same is in motion." This was a reasonable contract. It was intended for the safety and convenience of Sparks, who was a passenger, as well as for the protection of the railway company. It does not contravene any law or a sound public policy. We

perceive no good reason why its provisions may not be fully enforced. ( *Goggin v. K. P. Rly. Co.*, 12 Kas. 416 ; *Sprague v. Mo. Pac. Rly. Co.*, 34 id. 351 ; *Express Co. v. Foley*, 46 id. 457 ; *Pa. Rld. Co. v. Langdon*, 92 Pa. St. 21 ; *O'Donnell v. A. V. Rld. Co.*, 59 id. 239 ; *Creed v. Pa. Rld. Co.*, 86 id. 139, distinguished ; *Sedgwick v. I. C. Rld. Co.*, 34 N. W. Rep. [Iowa] 790 ; *Bates v. O. C. Rld. Co.*, 17 N. E. Rep. 638.)

Sparks, when he climbed upon the top of the car attached to the stock-train, and stood there or walked upon the top of the cars while the train was in motion, was not only in a place of obvious danger, but was also violating the express terms of his written contract. ( *Railroad Co. v. Lindley*, 42 Kas. 714 ; *Player v. Burlington, etc., Rly. Co.*, 62 Iowa, 723 ; *Martensen v. C. R. I. & P. Rly. Co.*, 15 N. W. Rep. 570 ; *Goldstein v. M. & St. P. Rly. Co.*, 21 Am. Rly. Rep. 391 ; 2 Wood, Railroads, § 304 ; *Pa. Rld. Co. v. Langdon*, supra ; *L. R. & Ft. S. Rly. Co. v. Miles*, 13 Am. & Eng. Rld. Cas. 10 ; Thomp. Carr. 265.)

Upon the admitted facts and the findings of the jury, Sparks cannot recover for his injuries which resulted from his occupying voluntarily a place of danger on the top of a moving car or train in violation of the terms of his contract. ( *Pa. Rly. Co. v. Langdon*, supra ; *Sedgwick v. I. C. Rld. Co.*, supra ; *Bates v. O. C. Rld. Co.*, supra.)

It is suggested on the part of the plaintiff below that he could not, under the terms of his contract, pass over or along the tracks at El Dorado from the incoming and the outgoing caboose without violating his contract, and therefore that he had the privilege of climbing upon the top of the car to ride to the outgoing caboose. The cabooses were only 400 or 500 feet apart, and Sparks had walked about half of that dis-

tance in the direction of the outgoing caboose before he got on top of the car. There was no necessity for his crossing any switch to get to the outgoing caboose, and the only track between the two cabooses was the main one. The jury found that there were no other trains in the yards of the railway company at El Dorado after Sparks reached there except the train carrying his stock, and the jury also found that there were no switch-engines passing back and forth or running in the yards. Therefore Sparks incurred no risk of any personal injury in walking from the incoming to the outgoing caboose. The yards of the railway company at the station, upon the night of his injury, were not a place of obvious or apparent danger. The court instructed the jury :

"In this case, it is not denied that the plaintiff signed a contract of shipment or bill of lading, expressly providing that he would remain in the caboose-car attached to the train while it was in motion, and that this agreement was binding upon the plaintiff, and would be sufficient to prevent a recovery by him upon the admitted facts, unless it were shown that there was either some actual necessity which impelled him after the train arrived at El Dorado to climb to the top of a stock-car, and remain in that position until the time of the accident, or some apparent necessity, under the surrounding circumstances, which would have led a man of ordinary caution and prudence to do as he did."

This instruction was misleading upon the facts disclosed upon the trial. It is true that Sparks testified that while walking in the direction of the outgoing caboose someone said "Let's go on top." But neither Sparks nor any other witness testified that this exclamation came from the conductor or anyone in charge of the train.

Again, an attempt is made to excuse the conduct of Sparks in violating his contract, because the conductor, before arriving at El Dorado, informed him and his men that he was in a hurry and would not stop over five minutes at the station, (see *Railway Co. v. Elliott*, 55 Fed. Rep. 949,) and that it had been his custom upon other occasions to climb on top of the cars and ride to the outgoing caboose. It appears that the stock-train was much longer at El Dorado than five minutes, and it also appears that, at the instance of Sparks, the conductor made a change of three cars containing his stock, which were at the front end of the train when it arrived at the yards, to the end of the train and next to the outgoing caboose. During the time these cars were being shifted in the trains, Sparks was on top of one of the cars shifted. He did not request the conductor or any of the trainmen to give him more time to walk from one caboose to the other, and he made no request concerning his stock or the train not complied with.

The trial court did not rest this case with the jury upon any custom of the railway company transporting stockmen on the top of cars from one caboose to another at El Dorado. On the other hand, the court observed to the jury that this custom "could not of itself justify or excuse the plaintiff for assuming any extra-hazardous position." But it does not appear that when Sparks or other persons rode upon the top of cars, with the consent of the trainmen, that they had contracted in writing not to do so. But, waiving all this, the contract in this case is controlling. Its terms cannot be set aside by mere usage or custom. (*Mason v. Mo. Pac. Rly. Co.*, 27 Kas. 83 ; *Warren v. S. K. Rly. Co.*, 37 id. 409 ; *U. P. Rly. Co. v. Estes*, 37 id. 715 ; *M. & C. R. Co. v. Womack*, 4 S. Rep. 619 ; 1

Thomp. 'Neg. 453–459 ; *Ferguson v. C. I. Rly. Co.*, 58 Iowa, 293 ; *Kroy v. C. R. I. & P. Rly. Co.*, 32 Iowa, 357 ; *Colf v. C. St. P. M. & O. Rly. Co.*, 58 N. W. Rep. [ Wis.] 409 ; *Clark v. Railroad Co.*, 36 N. Y. 138.)

We are referred to *I. & St. L. Rld. Co. v. Horst*, 93 U. S. 291, as favorable to a recovery by the plaintiff below.    In that case the conductor in charge of the train commanded the shippers to get out of the caboose and go on top of the cars.    In this case there is no claim that Sparks was commanded by the conductor to go on top of the cars.    This case differs from the *Horst Case*.    Here was a written contract that Sparks should remain in the caboose while the car was in motion.    Not so in the *Horst Case*.

Upon the admitted facts and the findings of the jury, the judgment will be reversed, and cause remanded with direction to the district court to render judgment for the plaintiffs in error, defendants below.

All the Justices concurring.